The next case on our calendar for argument today is L.S. v. Webloyalty.com, No. 183639. If it would please the Court, David Katz on behalf of the Plaintiff Appellant. Below Plaintiff asserted a claim under the Connecticut Unfair Trade Practice Act, otherwise known as CUTPA, that the District Court dismissed after declining to exercise supplemental jurisdiction. In fact, the Court had original jurisdiction as expressly pled in the complaint, and the parties agree that the judgment needs to be reversed as to the CUTPA claim and the case remanded to the District Court. While the CUTPA claim is being remanded to the District Court, we also strongly urge the Court to remand the Plaintiff's claim under the Electronic Fund Transfer Act, otherwise known as EFTA. EFTA requires that when an authorization for recurring electronic fund transfers is provided to a payee, that a copy of that authorization will be provided. And Webloyalty asserts that it provided two documents that accomplished that goal, the so-called Acknowledgement Page and the so-called Joint E-mail. The Acknowledgement Page is not a permanent record. It only flashed on the computer screen, and EFTA expressly requires that disclosures be given to a consumer in a manner that it could be kept. And so the Acknowledgement Page, as Judge Haidt rightly commented, is not particularly relevant to the discussion of compliance to EFTA's copy of the authorization requirement. I'll add that it also suffers from the same defects as the Joint E-mail. The Joint E-mail is not a copy of the authorization. In what What are the material differences, in your view, between the two, the Acknowledgement Page and the Enrollment Page? The Acknowledgement Page or the Joint E-mail, Your Honor? The Acknowledgement Page, I do believe, differs from the Enrollment Page in material respects. Right. And I'm asking you what those are. I thought the Joint E-mail was just the same. Oh, the Joint E-mail is actually a little different, and that's at A791 in the record. And the Joint E-mail was purportedly e-mailed to the plaintiff and was what Judge Haidt primarily focused on. And in particular, if you, the Joint E-mail, Web Loyalty admitted in its answer at A722 in the record that it is an electronic contract between the plaintiff and Web Loyalty. But that contract, a copy of it, was never provided to the plaintiff. In fact, in Supplement I to the — that's the staff comments to Regulation 8 — I guess what I'm asking is, there was a Joint E-mail that was provided that provided information that was similar to, at least, what was on the screen when somebody signs up. And my question is, what's the difference? I know your argument is that it's not a copy, and my question is more specific, though. What's different about it? I understand. Thank you, Your Honor. First of all, it doesn't mention recurring electronic fund transfers at all. It mentions that the consumer will be billed. A billing is a credit card transaction. And a credit card transaction is governed by congressional legislation, by a different statutory scheme than electronic fund transfers. Congress recognized billing to be materially different than deductions from a consumer's credit card or debit card account. But the Joint E-mail eliminates the phrase deduction and merely says that the consumer will be billed. Congress determined that's a material difference. The regulators have enacted different regulatory schemes for credit cards and for electronic this material difference between credit card transactions and electronic fund transfers. It says it will be billed by shopper's discount to the credit or debit card you authorized, and it will show on your card statement as of a certain day. Why isn't that enough the same? It will be shown on your debit card statement, even with the notion of billing, to mean that there will be a transfer, because that's how a debit card works. Well, I do believe that this is confusing language when EFTA requires clear language. And the manner that it's been presented here requires the consumer to put on a detective hat and figure out what exactly this is being said here. But if we're, I worry that we go from consumer confusion and the essence of a cut put claim to interpreting what a copy is under the act that the defendants had to comply with here. And is it your position that they, in order to comply, they needed to provide a screenshot of the entire enrollment page? Your Honor, I'm glad you asked that question, because in fact, Web Loyalty admitted on the record that it maintains the enrollment page, not as a screenshot, but in its archive server. And it was absolutely able to provide a copy of that. Is that your position, that that's what they had to do? Yes. Yes. However, we also, I'm sorry, Your Honor, also assert in the alternative that the language provided did not confirm a recurring electronic fund transfer. And even more, I want to point out to the Court that the joint email itself emanates from an unknown, unidentifiable sender. But the subject line says, as requested, your membership kit and billing details for shopper discount and rewards. So doesn't that overcome any ambiguity in the from line? Oh, actually, I think it creates more ambiguity, because I often receive, and I wonder if members of the Court have as well, an email that says it's from AT&T or from Netflix or, and, but when you look at the sender line, when you look at the subject, it says important information about your AT&T account. And when you look at the sender line, it doesn't say AT&T, or it doesn't say the corporation that's sending it. Well, what if the email had provided the enrollment page itself? According to your argument, you wouldn't know who's sending it to you. If, if WebLoyalty had properly identified itself consistent with the terms of consent, and I think that's the important thing that needs to be focused on here, is that under the eSign Act, WebLoyalty was only permitted to provide this disclosure to the plaintiff by email consistent with the terms of the consent on the enrollment page. The enrollment page says that shopper discounts and rewards will communicate with the plaintiff, not customer service ICSDR. This plaintiff never consented to receive emails from this unknown sender, and the fact that it emanates from an unknown sender renders the joint email a nullity. It's utterly irrelevant because it could not be provided to plaintiff outside the terms of consent, and it was. And a slightly different subject, the Consumer Financial Protection Bureau, which has some authority to construe EFTA, has issued Bulletin 6, and Bulletin 6 calls for a copy of the terms of the authorization to the consumer. So a copy of the terms is something other than a copy of the thing itself. It is a, it's a, it's a, it's a boiling down of what, of what would be important, and, and it specifically says, you know, deal with the timing and the amount of the That should be enough. Well, Your Honor, the CFPB in that bulletin also six times refers to the copy of the authorization. A copy of an authorization should contain the terms of the authorization. So I think that the use of the term, termed phrase, terms of the authorization is actually referring to the copy. It in no way negates the requirement to provide a copy of the authorization, just provides a requirement that the authorization itself reflect the terms. And in fact, over and over in the CFPB bulletin, it refers to instances where that didn't happen, where people, where the authorization didn't contain the terms. So the authorization itself, if you had it on a screen, if you saved it on a screen, it would have lots of other stuff on it other than the terms. And, and it's got little ads and, and everything else. So in some respects, it's not as useful as what your client actually got. I, I, thank you, Your Honor. Can I answer that? By all means. Please, please, I have a follow-up question as well. Thank you. Yes. Is, first of all, having received the, the actual contract, and like I said, it's been bindingly admitted that that document with all the extraneous details is a contract. You're saying the enrollment page? The enrollment page. Right. It would have the salutary effect of the, the consumer receiving this document in close temporal proximity to the time when it was executed and gain the ability to scrutinize that contract like anyone gets to do when they execute a contract and determine that pre-auth, electronic fund transfers were authorized. But more than that, Judge Haidt posited a situation where this enrollment page could perhaps be, contain lots of irrelevant details. Even though Judge Haidt previously held that, as did this court, that the enrollment page is clear. So putting aside that inconsistency, when we go to the joint email and take a look, it too is littered with irrelevant details that have nothing to do with an electronic fund transfer. And the question then becomes, this isn't a situation where there was a document filled with irrelevant details, followed up by a clear and succinct, here is your confirmation of your recurring electronic fund transfer authorization. In fact, what Web Loyalty did is it went and devised a new document filled with irrelevant details that have nothing to do with the transaction, and at the bottom included some form of information regarding some transaction that was purportedly that, that, that there, a transaction between the two. But I need to, I need to ask, so I'm a little confused about exactly what your position is about what, what, what Web Loyalty had to do to comply, and whether the term copy is ambiguous or not ambiguous, such that the CFPB, in construing it to mean a copy of the material terms and conditions, was going beyond the clear in the context of electronic fund transfers and the e-sign act and other variability of technology that, variables of technology that, you know, might make it empowered to protect, try to protect consumers in this way. So is it your position that copy means copy, CFPB has gone beyond the statute, and the only way to comply is to provide a screenshot of the actual document that I just break this down into? Please do. Your Honor. First of all, our position is that the joint email is not sufficient under EFTA. So, Your Honor, the court does not need to reach today the issue of whether copy means copy and authorization means authorization, because this joint email emanating from an unknown, unidentifiable sender filled with irrelevant diversionary only containing the important information on the bottom and omitting the fact that funds would be deducted from the consumer's account does not satisfy EFTA's requirement. But the requirement is what? This is following up on Judge Park's question. So you're suggesting by taking that position that had it provided all the material terms and conditions and mentioned electronic fund transfer, that it would have satisfied the statute. Is that right? I'm sorry, Your Honor. That's actually part two of this analysis. And part two of the analysis would be that a copy is that the determined — well, let me just back up one second. That the copy of the authorization versus a copy of the terms of the authorization needn't be decided today because web loyalty provided neither. So regardless of the ruler used to measure the document given to the plaintiff, copy of the authorization or copy of the terms of the authorization, web loyalty doesn't meet the test for the various reasons that have been discussed. That means we'd remand and the district court would be confused about what needed to happen next. Well, part two is I do believe that the Congress meant what it said, copy of the authorization. And as evidence of that, that the regulators believe that too. I don't believe the CFPB modified this for web loyalty. The CFPB considered a new situation where telephonic authorizations would now be allowed. And it contemplated a new situation where the consumer would not get a writing initially and would have no writing to get a copy of. So in those circumstances, the CFPB wanted to ensure that some meaningful document is provided to the consumer to ensure the consumer is aware of the authorization of electronic fund transfers, not to wipe out the requirement to provide a copy of a written contract to a consumer. And as evidence of that, if I may, Your Honor. Just finish up. You have two minutes rebuttal. We've kept you well past your time. Okay. I know. And I'm grateful for the opportunity to continue. But there's two items of evidence I'd like to point to. And one is the staff comment, Supplement I to Regulation 8. And the staff comments provide an example of compliance. And it says, give the consumer two contracts. Say sign one and return the other. Okay. Excuse me. Sign one and keep the other. The consumer has the entire contract in his hands at the end of that transaction. And obviously, the staff thought that was important to devise that. And also, in the CFP bulletin, the same example of compliance is provided, indicating that even though there's an adjustment being made to allow for telephonic authorizations, that in the situations where there's a written contract, that does not change. Okay. Thank you very much. You have two minutes rebuttal. We'll hear from Mr. Fleming. Good morning. And may it please the Court, Mark Fleming on behalf of the appellees. I think it's worth recalling what's not disputed at this stage. There's no dispute that the plaintiff did authorize the fund transfers. That was decided in the last appeal and is no longer at issue. Plaintiff agrees that the plain meaning of a copy includes not only an exact replica, but also an imitation. And the question is, an imitation of what? And the statute says, of such authorization. And this Court, in the prior appeal on page 106... Wait. The plaintiff agrees that an imitation counts? Yes. That's on footnote 12 of the blue brief on page 32 and also, again, on page 13 of the reply brief. Okay. So an imitation, that would be like a screenshot. Well, it could be a screenshot, but it's not limited to a screenshot. It can include as long as it provides... That would suggest still something other than a restatement of whatever the vendor considers to be material terms and conditions in an entirely different format. I don't think that's right, Judge Carney, because as this Court said in the prior decision, when talking about the enrollment page, the written authorization notes, quote, the terms of the transfer, including the amount to be deducted from appellant's account and the frequency with which the scheduled debits would take place. The joint email provides all of that. The authorization is the assent by the plaintiff to the terms of the transaction. How do we read copy? Copy means... Copy ambiguous? We think copy is simply broader than the plaintiff thinks it is. So we think it is clear that a copy means what the... They refer to a copy of the terms of the authorization and this bulletin... Statute just says copy, right? Copy of such authorization, yes. Copy of such authorization. And Congress knows how to say a copy of the terms and conditions of such authorization. It also knows how to say a replica or a facsimile. And we cite examples where Congress has required, you know, an absolute verbatim copy of something else. That's not what it has done here. And the agencies charged with its administration have said a copy of the terms of the authorization is sufficient. And that is certainly amply sufficient in order to satisfy the purpose of the statute. I had just difficulty in common parlance understanding how copy can mean something that looks so entirely different from what the L.S. originally signed off on. Because I think the difficulty here is Mr. Katz is arguing we had to provide a copy of the enrollment page. The statute says a copy of the authorization. And the authorization is part of what the enrollment page contains, but it's not its entirety. As Judge Jacobs indicated with his question, it includes other stuff that is peripheral to the authorization. But the authorization itself was in a box on the enrollment page, right? It was very clear what you were signing off on. It wasn't the ad or the coupon. It was the offer and billing details and your consent to receiving. It's in a box and it's colored in. That's the authorization. That's the operative language. And to me that looks that a copy in common parlance would mean a copy of that and not a retyping of some of those terms. And as your colleagues pointed out, it doesn't refer to electronic transfers. It restates. It says that your credit card will be billed or debit card will be billed. It doesn't use the same language even. So as a consumer, I'm subject to the vendor's reformulation of what I've authorized. I don't think, Judge Carney, that that is a meaningful reformulation in any sense of the word. Because when you are, he agrees, I believe, that billing means charging. In fact, this court's previous opinion refers to web loyalties monthly charges. He himself on page, I believe it's page eight of the blue brief, refers to them as recurring monthly charges. When you charge a debit card, the money is deducted from the account. That's how a debit card works. So the fact that we didn't use the word deducted in the joint email, I mean, there's no possible confusion as what's going to happen. It says $12 will be billed monthly. It provides the card. It says Visa and it has the card number and it says the date of the first billing. The sentences are short. They're clear. There's a number to call if there's any confusion. It's plenty to allow the member to figure out whether the charges that ultimately appear are authorized and match the terms that he assented to. I still just have a difficulty understanding that as a copy. A copy, to me, means a visual replication. And Congress didn't say a copy of the terms and conditions or restatement of the terms and conditions. And that's why the CFPB's kind of casual flipping back from a copy of such authorization to a copy of the terms and conditions. I find somewhat perplexing because I'm not sure the statute goes that far. And as a skeptical consumer, I like to see exactly what it is I signed. I don't want to have someone else's restatement of it. And so I'm a little confused about how to approach this. Do I need to think of this as copy being somewhat ambiguous in this context and the CFPB and the Federal Reserve being charged with interpreting it as in the context of electronic transfers and the E-Sign Act was within their authority to say, this is how you can satisfy that language? Or I think you certainly can think of it that way. We don't think you need to in the first instance. We think copy is clear in that it is broader than simply an exact replica or facsimile. Those are words Congress uses elsewhere and didn't use here. If that's not convincing to the court, then I think the most we get to is that the section copy of such authorization is ambiguous. And in that situation, not only the CFPB, but also the staff of the Federal Reserve in comments that are also persuasive under the Supreme Court's decision in Milholland, all talk about the terms of the authorization. And that's fully consistent with the purpose of the act. Your client, though, does retain a actual copy or a screenshot of the enrollment page. Is that right? I want to be clear about this because there's been a lot of confusion here. We do not keep a copy of the enrollment page with the plaintiff's personal information, e-mail address, and card number in it. If we did that for all of our members, that would require untold server space to do. We, of course, do have the text and layout of the enrollment page with the blank boxes, and that's what Your Honor sees in the appendix, that we do have. I would require an enormous amount of space. It would be one page for every customer. Correct. And, you know, there are— for every customer. I don't—I mean, the space issue doesn't seem to— Keep it electronic. —amount to anything. Keep it electronically. No, you— Pop it up to the cloud. I've got— Well, that's the point. It would require server space. I don't mean a warehouse. I mean, you'd need a server with millions of pages for millions of customers. And Congress could have mandated that, but it hasn't. In this instance, the minor plaintiff contends he does not remember getting anything. Is that right? He said in his deposition he doesn't remember either way. He did not say he didn't get it. He says he has no memory of what happened. He doesn't remember one way or the other. Correct. Did not remember either way. So— Is this issue one that has to be resolved on this appeal? If the minor plaintiff doesn't remember getting anything, and we happen to know what it is you claim was sent, there's no claim—he can't very well claim that he was misled. If he got a copy of the terms and conditions, is it necessary that he be misled, or is this, as I suspect, an absolute requirement that whatever the copy is has to be sent? So a couple of points. I mean, the question of whether he was misled by something he got is something this court resolved in the previous appeal. So that, you know, the fraud claims are out of the case. The only argument remaining under EFTA is whether he received a copy of such authorization. Yes. Under EFTA, does one have to say, to have a claim under EFTA, that I did not receive a copy of the terms and I didn't understand that I owed this money on these terms? Well, we're here on summary judgment, so there has to be evidence at this point that EFTA was not complied with. We have—we provided the district court with evidence— But if compliance with EFTA requires a copy of the terms as presented visually to the plaintiff when he is alleged to have signed it, then that's all that's needed for summary judgment purposes. Well, we would say— It's a fact issue that that's all that's needed. We would say that the facts show that he got everything he was entitled to under EFTA and there's nothing on the other side— Defining what it is he's entitled to. Well, that's—yeah, I'm sorry. I don't mean to be difficult. I mean, that's the dispute among us is, does the requirement of a copy of such authorization, is that satisfied by what the Federal Reserve and the CFPB have said satisfies it? What the courts who've decided the issues when the authorization is telephonic, not by creating a judicial exception to the statute, but by interpreting and applying the statute the way it was meant to be applied. What satisfies the statute when the transaction is telephonic is arguably precisely what your client sent in this case. Yes, Your Honor. And the question is, what is the difference in terms of the actual notice to a consumer that the consumer knows what it is he or she is signing up for? What is the difference? There is no difference. That's why Mr. Katz is incorrect when he says there's some kind of exception for telephonic authorization. If Mr. Katz were right, then a telephonic authorization would have to be followed up by a recording or maybe a verbatim transcript of the phone call. That's not the way it works. You can provide a copy of the terms of the authorization, which are relevant to the key material terms of the transaction, which is exactly what we did. And there's nothing in the statute that says there's a different way of doing it when the authorization is by phone versus when it's online. That's why we think that the standard is the same regardless of how the authorization is provided. And as Your Honor says, what we did is exactly the same as what happens in the telephone cases. So we don't think there's any difference there. Let me just ask you, am I right in understanding that you agree that the case needs to be remanded because there was CAFA jurisdiction? That's exactly right, Your Honor. It needs to go back. There's a fully briefed motion for judgment on the pleadings on the merits, which we think should be granted, but it hasn't been addressed and should be addressed in the first instance by the district court. Very good. Anyone else? All right. Thank you very much. I thank the Court for its time. Thank you. Mr. Katz, you have two minutes rebuttal. Thank you, Your Honor. Mr. Fleming said that the joint e-mail is exactly what a consumer would get in the case of a telephonic authorization. In fact, a case is in the record, the Blatt case, and unfortunately was cited in defendant's reply brief in the district court, so we could not put in the record, in fact, the actual communication that went to Mr. Blatt in the Blatt case. Well, then this is your opportunity. And it's in the docket of the Blatt case, and we cite it. And in fact, in the Blatt case, Mr. Blatt didn't get any extraneous details. He didn't get a document filled with advertising, with the facts buried at the bottom. He got a clear and unequivocal notice. You authorized recurring electronic fund transfers and nothing else. What's the norm for online transactions? I mean, I don't think I've gotten a screenshot for online purchases. Well, this is for recurring electronic fund transfers. And that is expressly, under EFTA, required that that copy of the authorization  And as Judge Jacobs said, I'm sorry. If you could try to answer the question. What is the norm, is just it. For recurring authorization on a credit card, do you have a sense of what companies in this space typically do? That they provide a copy of the contract providing for the recurring electronic fund transfers and not a new document filled with extraneous, off-topic, irrelevant details. And a matter of fact, we believe, we urge the court to note the red flag here that I believe Judge Jacobs had caught. Is that this document, this enrollment page is in Web Loyalty's archive server and could have been provided. It was the least burdensome, least expensive thing to do, would have been to email him that copy. But instead... I understood your adversary to say that they have a copy of the contract. They have a copy of the blank template. But they do not have an electronic version of the completed form. Is that incorrect? That's correct. However, even receiving the blank template would have had the salutary effect of the plaintiff seeing the contract he purportedly signed. And... It wouldn't show that he signed it. And it wouldn't show there was an obligation. But they would say that, well, I believe that they should provide it signed. But even if they provided it blank, it would have... And with the representation that here's what you signed. It would alert a consumer to scrutinize this document. I understood your adversary to say that they could have kept a copy of every screenshot signed by every customer, but it would have required space in the cloud. But whichever they did, send the blank template or send a signed version. The question, I believe, the real red flag here is why instead of sending the blank template, devise a different document with different language, paraphrasing, removing parts of the offer and billing details, and recasting it. Why do that? And the marketers like Web Loyalty that are watching what this court does. And if, in fact, this consumer protection is watered down in the way Web Loyalty wants it watered down so it could continue to unfairly and deceptively deceive consumers, then that's what's going to happen in the future. Mr. Katz, we're in a different age now where all kinds of things are permitted that weren't when we'd go and, you know, visit in person the vendor of some, you know, service, the oil company that's delivering our oil every month. You know, we sign the thing and there's a carbon copy. I mean, the e-sign act that seems to bear heavily on how EFTA is interpreted includes electronic signature. It means it says electronic signature can include a sound, symbol, or process. I have no idea really what that means, but we're conducting real estate transactions and all kinds of things not in person with security techniques and measures that are unlike what used to be the case. And as Judge Park was pointing out, we don't always get screenshots. People have gotten comfortable with a click on the terms here and click on the terms there. And either you print them out or don't. And even the prior, the enrollment page, the acknowledgement page, confirmation page says print these out, print these out, print these out. And that clearly doesn't satisfy the statute in which the vendor has to provide a copy of such authorization. Nonetheless, you know, it seems that the CFPB might have been within its authority to interpret copy of such authorization as it has. Isn't it right to look at the whole context of, you know, current technology, what Congress has said in the e-sign act, as well as EFTA in determining what a copy of such authorization might be? I'm just having a hard time seeing how technology changes the fact that this is a contract that was provided and that the joint email was being sent to the plaintiff. So I don't understand how technology would require web loyalty to remake the enrollment page and change the terms of the offer and billing details because of technology. The reason it did that is because it's engaged in sham marketing and doesn't want anyone to know that. That's why it changed it. Not because of regulatory burden or changing technology. That argument underscores, that's your cut paw argument, that this was deceptive with regard to the consumer. But the CFPB is charged with interpreting and applying this statute and understanding what a copy would be. And they're interpreting it in this way, a copy of the terms and conditions. You say it wasn't sufficient, but, you know, we do owe the CFPB some deference in understanding what a copy is, don't we? Your Honor, I respectfully disagree that CFPB authorized carte blanche to payees in how they go about confirming recurring electronic fund transfers. The CFPB expressly at the beginning of this non-binding statement of policy says it's dealing with the situation of a new technology, telephonic authorizations. And I don't understand how accommodating this new technology of electronic fund transfers changes Web loyalty's obligation, after having provided a written contract, to provide that written contract. I do understand why it would, why providing a sound file to a consumer might be unhelpful. And, as a matter of fact, and explains why the CFPB indicated that in circumstances where there isn't a written contract, that a telephonic authorization, that those terms and conditions must be provided. They've got to be provided somewhere. All right. Thank you very much. We'll take the matter under review.